**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **BRICE IKBY BINISSIA and HALINA SUCHECKA, Individually and on Behalf of All Others Similarly Situated,**<br><br>Plaintiff,<br><br>v.<br><br>**ABM Industries Incorporated, et al.,**<br><br>Defendant. | No. 13-cv-1230<br><br>Judge Joan B. Gottschall<br><br>Magistrate Daniel G. Martin |

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CONDITIONAL COLLECTIVE ACTION CERTIFICATION

# TABLE OF CONTENTS

PAGE

I.   INTRODUCTION ................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................... 3

    A.   The North Central and Northeast Super-Regions of ABMJ .................. 3

    B.   Timekeeping In The North Central and Northeast Super-Regions...................... 5

        1.   North Central ................................................................ 5

        2.   The Northeast Super-Region.................................................. 8

    C.   The Divergent Testimony of Former and Current Janitors................... 9

        1.   Chicago Area Janitors ...................................................... 9

        2.   New York City Janitors .................................................... 14

III. LEGAL ANALYSIS........................................................................ 14

    A.   The Legal Principles Governing Plaintiffs' Request for Judicial Intervention .................................................................... 14

    B.   Notice To Tens of Thousands of Employees Is Inappropriate Where Plaintiffs Have Failed To Make Even A Modest Factual Showing Of A Systemic Policy that Routinely and Uniformly Deprives All Janitors of Pre-Shift Wages .............................................................. 18

        1.   Plaintiffs cannot root their claims in ABMJ's "rounding practice."........ 18

        2.   Plaintiffs have not made a factual showing of a corporate policy that uniformly requires uncompensated pre-shift gap time work of all janitors across 27 states........................................ 19

    C.   Plaintiffs' Claims are Incapable of Proof Via Representative Evidence, which Undermines the Core Efficiencies Section 216(b) is Designed to Achieve ......................................................................... 24

        1.   Separate proof is necessary to establish whether, why and how much janitors performed work outside of their scheduled shifts............ 24

**TABLE OF CONTENTS**
(CONTINUED)

PAGE

2.   Separate proof is necessary to establish whether ABMJ is entitled to offset paid non-working time against unpaid pre-shift working time ................................................................................................ 28

3.   Separate proof is necessary to establish whether ABMJ's "rounding practice" benefited janitors or worked to their detriment ....... 29

IV.   CONCLUSION ............................................................................................ 30

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Adair v. Wisconsin Bell, Inc.*,
  2008 U.S. Dist. LEXIS 68942 (E.D. Wis. Sept. 11, 2008) ...................................14, 15, 16, 28

*Babineau v. Fed. Express Corp.*,
  576 F.3d 1183 (11th Cir. 2009) ...................................................................................18, 23

*Barefield v. Vill. of Winnetka*,
  81 F.3d 704 (7th Cir. 1996) .................................................................................................27

*Bergman v. Kindred Healthcare, Inc.*,
  2013 U.S. Dist. LEXIS 82238 (N.D. Ill. June 11, 2013) .......................................................14

*Blakes v. Illinois Bell Tel. Co.*,
  2011 U.S. Dist. LEXIS 43147 (N.D. Ill. Apr. 21, 2011) .......................................................14

*Boelk v. AT&T Teleholdings, Inc.*,
  2013 U.S. Dist. LEXIS 20606 (W.D. Wis. Jan. 10, 2013) ...............................................16, 19

*Boyd v. Alutiiq Global Solutions*,
  2011 U.S.Dist. LEXIS 88656 (N.D.Ill. 2011) .......................................................................22

*Brooks v. Bellsouth Telecomm. Inc.*,
  2009 U.S. Dist. LEXIS 20552 (N.D. Ga. Feb. 10, 2009) .......................................................14

*Brooks v. Safety-Kleen Sys., Inc.*,
  2012 U.S. Dist. LEXIS 117035 (N.D. Ill. Aug. 14, 2012).................................................13, 25

*Clark v. Honey—Jam Café, LLC*, 2013 U.S. Dist. LEXIS 62461 (N.D. Ill. Mar. 21, 2013).........15

*Collazo v. Forefront Educ., Inc.*,
  2010 U.S. Dist. LEXIS 7661 (N.D. Ill. Jan. 28, 2010) .........................................................20

*Comcast Corp. v. Behrend*,
  ___ U.S. ___, 133 S. Ct. 1426 (2013)...................................................................15, 16, 26

*Cornn v. United Parcel Serv., Inc.*,
  2005 U.S. Dist. LEXIS 30419 (N.D. Cal. Aug. 26, 2005).................................................18, 23

*Demarco v. Northwestern Memorial Healthcare*,
  2011 U.S.Dist. LEXIS 88651 (N.D.Ill. 2011) .......................................................................20

# TABLE OF AUTHORITIES
## (CONTINUED)

PAGE

*Dreyer v. Altchem Envtl. Servs.*,
   2006 U.S. Dist. LEXIS 93846 (D.N.J. Dec. 12, 2006) ...........................................18

*Dukes v. Wal-Mart Stores, Inc.*,
   ___ U.S. ___, 131 S. Ct. 2541 (2011) .............................................................15, 16

*Espenscheid v. DirectSat, LLC*,
   705 F.3d 770 (7th Cir. 2013) ..................................................................... passim

*Franks v. MKM Oil, Inc.*,
   2012 U.S. Dist. LEXIS 128205 (N.D. Ill. Sep. 7, 2012) ...................................19

*Hawkins v. Alorica, Inc.*,
   287 F.R.D. 431 (S.D. Ind. 2012)..........................................................................22

*Hipp v. Liberty Nat'l Life Ins. Co.*,
   252 F.3d 1208 (11th Cir. 2001) ...........................................................................14

*Hipp v. Liberty Nat'l Life Ins. Co.*,
   164 F.R.D. 574 (M.D. Fla. 1996)..........................................................................28

*Hoffman-LaRoche, Inc. v. Sperling*
   493 U.S. 165, 169 (1989)........................................................................................13

*IBP, Inc. v. Alvarez*,
   546 U.S. 21 (2005)...................................................................................................24

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
   556 F. Supp. 2d 941 (W.D. Wis. June 2, 2008) ..................................................27

*Kelly v. Bank of Am., N.A.*,
   Case No. 10 C 5332, ECF # 151 (N.D. Ill. Sep. 23, 2011) ..................................28

*Martinez v. Cargill Meat Solutions*,
   265 F.R.D. 490 (D. Neb. 2009)..............................................................................28

*Martinez v. Regency Janitorial Servs., Inc.*,
   2012 U.S. Dist. LEXIS 5941 (E.D. Wis. Jan. 26, 2012).......................................23

*Masterson v. Fed. Express Corp.*,
   269 F.R.D. 439 (M.D. Pa. 2010)....................................................................18, 23

**TABLE OF AUTHORITIES**
**(CONTINUED)**

PAGE

*McElmurry v. US Bank Nat'l Assoc.*,
2004 U.S. Dist. LEXIS 15233 (D. Or. July 27, 2004) ............................................17

*Merlo v. Fed. Express Corp.*,
2010 U.S. Dist. LEXIS 56108 (S.D. Fla. June 7, 2010) ...................................18, 23

*Munsch v. Domtar Indus., Inc.*,
587 F.3d 857 (7th Cir. 2009) .................................................................................24

*Nehmelman v. Penn Nat'l Gaming, Inc.*,
822 F. Supp. 2d 745 (N.D. Ill. 2011) .....................................................................19

*Nichols v. City of Chicago*,
789 F. Supp. 1438 (N.D. Ill. 1992) ........................................................................24

*Nogueda v. Granite Masters Inc.*,
2010 U.S. Dist. LEXIS 37657 (N.D. Ill. April 14, 2010) .......................................14

*Pirant v. U.S. Postal Serv.*,
542 F.3d 202 (7th Cir. 2008) .................................................................................24

*Powers v. Centennial Commc'ns. Corp.*,
679 F. Supp. 2d 918 (N.D. Ind. 2009) ...................................................................15

*Ruiz v. Serco, Inc.*,
2011 U.S. Dist. LEXIS 91215 (W.D. Wis. Aug. 5, 2011).......................................16

*Saleen v. Waste Mgm't., Inc.*,
2009 U.S. Dist. LEXIS 49891 (D. Minn. June 15, 2009).......................................15

*Slayton v. Iowa College Acquisition Corp.*,
2010 U.S. Dist. LEXIS 106643 (N.D. Ill. Oct. 5, 2010).........................................23

*Smith v. Family Video Movie Club, Inc.*,
2013 U.S. Dist. LEXIS 54512 (N.D. Ill. Apr. 15, 2013) ...................................19, 21

*Smith v. Safety-Kleen Sys., Inc.*,
2012 U.S. Dist. LEXIS 5908 (N.D. Ill. Jan. 18, 2012) ..........................................27

*Strait v. Belcan Eng'g Group, Inc.*,
911 F. Supp. 2d 709 (N.D. Ill. 2012) .....................................................................16

# TABLE OF AUTHORITIES
## (CONTINUED)

PAGE

*Thompson v. Speedway SuperAmerica,*
    2008 U.S. Dist. LEXIS 115050 (D. Minn. Aug. 21, 2008) ..............................................18, 21

*Tum v. Barber Foods,*
    331 F.3d 1 (1st Cir. 2003)...........................................................................................................24

*Vang v. Kohler Co.,*
    488 Fed. Appx. 146 (7th Cir. 2012).........................................................................................15

*Woods v. New York Life Ins. Co.,*
    686 F.2d 578 (7th Cir. 1982) ....................................................................................................14

**STATUTES**

29 U.S.C. § 216(b) ............................................................................................................... passim

FLSA........................................................................................................................................ passim

**OTHER AUTHORITIES**

29 C.F.R. § 785.48 .....................................................................................................................17

29 C.F.R. § 785.48(b) ................................................................................................................17

Federal Rule 23 ................................................................................................................15, 16, 19

Federal Rule 26(a)(2) .................................................................................................................17

Rule 23 and § 216(b)...................................................................................................................19

29 C.F.R. § 785.48(a).................................................................................................................18

## I.      INTRODUCTION

At the onset of this case, Plaintiffs sought to bring every janitor employed nationwide by subsidiaries of Defendant ABM Janitorial Services, Inc. ("ABMJ") into this Courtroom.  All of them.  They now concede that janitors in two of ABM's four "Super-Regions" (South Central and West Super-Regions) should not be sent notice to join this lawsuit (*see*, ECF # 136, n.1). The case to include the 60,000+ janitors employed in the remaining two Super Regions (North Central and Northeast) fares no better.  There is no factual basis or legal justification to allow them to join this case. Despite waves of discovery, Plaintiffs have failed to make even a modest factual showing that this still huge cohort is similarly situated in a manner that justifies their inclusion.

Plaintiffs acknowledge that this case is not about rounding but whether "janitors are ... compensated for their pre-shift compensable activities" (ECF # 136, at 2).  They have not, however, shown any systemic policy or practice that deprives janitors of pre-shift compensation throughout the 27 states comprising two Super-Regions of ABMJ.  The common fact that janitors frequently arrive at work early does not get Plaintiffs out of the collective action starting gate.  Differences abound amongst the janitors employed at thousands of different jobsites— differences that make this case wholly inappropriate for collective action treatment.  Janitors arrive to work early, at different times, for different personal reasons.  They punch-in early at different times, for different reasons.  Different pre-shift clock-in procedures and different timekeeping methods are used at different jobsites.  Opt-in Plaintiffs testified to doing different things when they arrive at work, things which may not be compensable as a matter of law. Janitors' schedules differ from one jobsite to another; *e.g.*, some are scheduled for eight hour shifts with a half hour paid lunch, others are scheduled for eight and a half hour shifts with a half-hour unpaid lunch, which means that Defendants' offset defense (offsetting paid breaks

against any uncompensated time) is more viable against some janitors than others. The surfeit of discovery taken to date demonstrates that Plaintiffs' summary contention that 60,000 janitors were not paid for pre-shift compensable activities is not a question that can be resolved based on common inquiries and proof but rather is one for which the Court will need to conduct individualized inquiries.

Plaintiffs' evidentiary record is startlingly deficient—they have presented no declaration or deposition testimony whatsoever from any of the 33,000 janitors employed in the Northeast Super-Region's 21 branches that cover 12 states. Thus, the record as to these janitors is silent, which frankly, speaks volumes. In fact, Plaintiffs' own expert (who was not disclosed before Plaintiffs filed their brief) indicates that it was unlikely that janitors in the states of Virginia and Massachusetts performed uncompensated pre-shift gap time work because the expert concluded that their time was rounded "less than 2 minutes, which indicates that the rounding for the employees at these particular locations within these states was not materially different from the actual times." (ECF # 139-2, at 7) (emphasis added). Thus, Plaintiffs' own expert agrees that janitors in the states of Virginia and Massachusetts do not fit the theory of Plaintiffs' case. Regarding janitors in the States of New York, Connecticut, Pennsylvania and Maryland, the expert says their circumstances "warrant further investigation." Such wishful thinking provides no factual basis for sending notice to janitors in those states.

Evidence Plaintiffs have presented—from janitors in the Chicago area only—is paper thin. The declarations they have offered constitute 0.16% of the putative class members in this case. None are from janitors in the 26 other states they seek to sweep into this case. The Seventh Circuit has rejected such thin gruel, concluding in *Espenscheid v. DirectSat, LLC*, 705 F.3d 770, 774 (7th Cir. 2013), "what can't support an inference about the work time of thousands

of workers is evidence of the experience of a small, unrepresentative sample of them." The deposition testimony from opt-in Plaintiffs proves conclusively that the work experience of one janitor simply cannot be extrapolated to another, let alone to more than 60,000 janitors employed across 27 states. They are simply too different.

In short, it is crystal clear now that neither liability nor damages are susceptible of measurement on a collective basis in this case; conditional certification, notice and further "merits" discovery simply will not change that inescapable conclusion. Plaintiffs' motion for conditional collective action certification must be denied, and the individuals who have filed consent to join this lawsuit as opt-in plaintiffs pursuant to 29 U.S.C. § 216(b) must be dismissed.

## II.     FACTUAL BACKGROUND

### A.     The North Central and Northeast Super-Regions of ABMJ.

ABMJ, through its subsidiaries, is among the largest providers of janitorial services to businesses in the United States. (Declaration of Raymond Suerth, ¶ 6) (attached as Exhibit 1). Janitors are employed across literally thousands of jobsites nationwide, and typical janitorial services provided at these jobsites include floor cleaning, window washing, dusting and carpet cleaning. (*Id.* at ¶¶ 3, 6). ABMJ is organized into four "Super-Regions": North Central, Northeast, South Central and the West. (*Id.* at ¶ 6). The North Central (or Midwest) Super-Region has 15 branches (not including the branch housing regional administrative employees) covering the states of Illinois, Michigan, Indiana, Ohio, Kentucky, Wisconsin, Missouri, Kansas, Nebraska, North Dakota, South Dakota, Minnesota and Iowa. (*Id.* at ¶ 2). Currently, approximately 13,000 janitors are employed in the North Central Super-Region at over 2,700 jobsites. (Suerth Dep. 9-10, ECF # 137-1). The North Central Super-Region has employed over 30,000 janitors since February 2010, the three-year period preceding the filing of the original complaint in this case. (Suerth Decl. ¶ 1).

The Northeast Super-Region has 19 branches that encompass jobsites in New York, Maine, Vermont, New Hampshire, Rhode Island, Massachusetts, Connecticut, New Jersey, Pennsylvania, Delaware, Washington D.C., Maryland, Virginia, and West Virginia. (Declaration of Fred Surace ¶ 1, attached as Exhibit 2). Approximately 17,000-18,000 janitors are currently employed in the Northeast. (Surace Decl. ¶ 2; Tarazi Dep. 85-86, ECF # 137). Since February 2010, approximately 33,000 janitors have been employed in the states that currently comprise the Northeast Super-Region. (Surace Decl. ¶ 2).

Schedules and pre-shift procedures differ between jobsites. For example, the Chicago Branch may contract with building owners or management companies to clean all tenant floors in a tall office building like the AON Center at 200 East Randolph or the Hyatt Center at 71 South Wacker. (*Id.* at ¶ 3). These buildings require large crews of janitors to clean the entire building at night. For example, the AON center currently has 52 cleaners on the second shift from 5 p.m. to 1:30 a.m. (Declaration of Maggie Szwab, ¶ 2, attached as Exhibit 3). The Hyatt Center at 71 South Wacker has 43 cleaners who work the second shift from 5 p.m. to 1 a.m. On the other hand, the Omaha Branch does not clean many tall buildings, since there are far fewer tall buildings in Nebraska, but instead has had a number of accounts that have multiple small branch offices. (Declaration of Robert Rooney, ¶ 2, attached as Exhibit 4). Individual janitors may clean multiple small jobsites in a single shift and work unsupervised. *Id.* The procedure for punching-in and out at these small jobsites in the Omaha Branch is very different than the procedure for punching-in and out at a large office building in the Chicago Branch. (*Compare* Declaration of Donna Dachowski, ¶ 4, attached as Exhibit 5 *with* Rooney Decl. ¶ 2).[1]

---

[1] Janitors employed in the Omaha Branch recorded their time on paper sign-in sheets until early 2011, at which time they began recording their working time via MITC, a different IVR system that did not round. (Rooney Decl., ¶ 3).

ABMJ's written policies require janitors to accurately report their working time and prohibit janitors from performing work off-the-clock, including, without limitation, starting work early.[2]  These core policies are reinforced in a written acknowledgement that each janitor is required to sign.[3]  They are also clearly conveyed to supervisors and managers.[4]

## B.  Timekeeping In The North Central and Northeast Super-Regions.

### 1.  North Central

During the preceding three years, North Central has utilized four different timekeeping methods that have varied across jobs:  handwritten timesheets, manual punch clocks, biometric timeclocks and a phone-in technology called IVR or interactive voice response.[5]  (Suerth Decl., ¶ 6).  The process for paying janitors who have utilized handwritten timesheets and manual punch cards has been the same:  (1) the janitor records his or her time-in and out either on a sign-in sheet or punch card, (2) the janitor's supervisor completes a separate payroll upload report, usually in Excel, based on the times recorded on the sign-in sheets and punch cards; and (3) the supervisor turns in the payroll upload report to the payroll department for check processing. (*See*, Defendants' Answer to Interrogatory No. 1, attached as Exhibit 7).  The paychecks are cut based on what the individual supervisors report on the payroll upload report; the payroll department does not determine for how many hours a janitor will be paid.  (Suerth Decl., ¶ 8).

---

[2] *See*, ABMJ's Service Worker Policy Handbook at 44-45, cited excerpts are collectively annexed as Ex. A to the Declaration of Stephanie Kelly, attached as Exhibit 6).

[3] *See*, Employee Instructions, Information and Work Rules, annexed as Ex. B to the Kelly Decl.

[4] *See*, Staff & Management Policy Handbook at 59-60, cited excerpts are collectively annexed as Ex. C to the Kelly Decl.

[5] Biometric timeclocks and IVR are considered electronic forms of timekeeping. With biometric timeclocks, janitors punch-in and out on a timeclock utilizing a thumb or fingerprint. (Tarazi Dep. 108).  With IVR, janitors call a specific phone number and punch-in and out by entering their employee number on the phone keypad.  (Tarazi Dep., 24).  With manual punch clocks, janitors insert a cardboard punch card into the punch clock, which stamps a time in and out on the punch card.  (Dachowski Decl., ¶ 6).  With handwritten sign-in sheets, janitors write down their start and stop times on a form.  (Binissia Dep. II., 35-36, 39-40, 46, 60-61).

Although the procedure for collecting time and processing payroll is the same for janitors who use timesheets and punch cards, Plaintiffs have excluded from this case janitors who used handwritten timesheets (*see*, ECF # 88, at 2),[6] likely in recognition of the individualized and manageability issues that handwritten sign-in sheets present—*which are no different than the individualized and manageability issues that punch cards present.*

The Chicago downtown branch currently employs about 4,000 janitors in over 350 jobsites in and around the Chicago area, and the shifts and the breaks during the shifts vary by building. (Suerth Decl., ¶ 5). For example, at some buildings, like One Prudential Plaza at 130 East Randolph Street, janitors are scheduled for an 8.5 hour shift, from 5 p.m. to 1:30 a.m., with a half hour unpaid lunch and two ten minute paid breaks. (Declaration of Donna Kljucanin, ¶ 1, attached as Exhibit 8). Similarly, janitors at the AON building at 200 East Randolph who work the second shift are scheduled for an 8.5 hour shift, from 5 p.m. to 1:30 a.m., with two fifteen minute breaks and a half-hour *unpaid* lunch. (Szwab Decl., ¶ 2). Both the Prudential and AON buildings have punch clocks. (Kljucanin Decl., ¶ 3, Szwab Decl. ¶ 3). At other buildings, like 71 South Wacker, 111 E. Wacker and 500 West Monroe, janitors are scheduled for an eight-hour shift, from 5 p.m. to 1 a.m., with a half-hour *paid* lunch. (Dachowski Decl., ¶ 4; Szwab Decl., ¶ 3, 5). During the past three years, these three buildings have had a manual punch clock.[7] The supervisors at these buildings generally have their crews punch-in and start work at the start of the scheduled shift and have not witnessed anyone start working before the start of their scheduled shift. (Szwab Decl., ¶ 3, Dachowski Decl., ¶¶ 4-6). They make sure that the janitors

---

[6] In this ruling on motions to compel, Magistrate Martin noted, based on Plaintiffs' counsel's representations made in court, that "[s]ome of Defendants' sites also used handwritten timesheets, which are not at issue in this case." (ECF # 88, at 2).

[7] Janitors at 71 South Wacker generally punch in and out almost exactly eight hours apart. (Dachowski Decl., ¶ 6).

on their crews are paid for all hours that they work. (*Id*.).

Janitors who work the day shifts are referred to as day porters. In contrast to the second shift at 111 East Wacker and 500 West Monroe, which is an eight-hour shift, day porters at these buildings are scheduled to work an eight and a half hour shift from 8 a.m. to 4:30 p.m. with two paid breaks and a half hour *paid* lunch. (Dachowski Decl., ¶¶ 4-5).

ABMJ is currently modernizing its timekeeping systems nationwide by moving from the use of handwritten sign-in sheets and manual punch clocks to electronic timekeeping, either biometric or IVR. (Suerth Decl., ¶ 7). With the nationwide rollout of this electronic timekeeping system, interchangeably referred to as Blueforce, EPAY or Workforce Management ("WFM") (Tarazi Dep., 53), janitors are and will be paid exactly to the minute—*i.e.*, if they punch in at 4:59 p.m. and punch out at 12:58 a.m., they will be paid for seven hours and 59 minutes, assuming that they had a half-hour paid lunch. (Tarazi Dep., 27; Suerth Decl., ¶7). Prior to the nationwide WFM rollout, some jobsites in the Chicago area utilized EPAY: the Chicago Board of Trade ("CBOT"), 10 South LaSalle and Metra at 547 West Jackson used biometric timeclocks; and seven Tollway jobsites used IVR. (Suerth Dep., 29). Pre-shift rounding rules were set-up in the EPAY system up until recently for these jobsites that separately rounded punch-in and punch-out times. (*Id*. at 129-130, 204-206). For example, at CBOT, a janitor could punch-in up to 30 minutes before the start of his scheduled shift and his time would be rounded to the start of his scheduled shift. (*Id*.). At Metra, a 15-minute pre-shift rounding rule existed; *i.e.*, if a janitor punched in anytime within a 15-minute window before the start of his scheduled shift, his time was rounded to the start of the shift. (*Id*.). Rounding ceased at these sites in March and April 2013. (*Id*.).

The Milwaukee Branch, which currently employs 750-800 janitors in Wisconsin and

Northern Illinois, uses a different IVR system called Tele-team that used a different rounding rule than any other branch in North Central. (Declaration of Doug Carter, ¶3, attached as Exhibit 9). The rounding rule used in Tele-team until recently rounded janitors' total time on the clock as opposed to rounding the janitors' punch-in and punch-out times. Thus, a janitor in Green Bay, Wisconsin who recorded 7 hours and 8 minutes in a workday was paid for 7.25 hours; if he recorded 7 hours and 7 minutes in a workday, he was paid for 7 hours. (*Id*).[8]

### 2. The Northeast Super-Region.

Janitors in the Northeast have utilized handwritten sign-in sheets, manual punch clocks, biometric timeclocks and IVR as time and attendance keeping methods during the statutory period. (Tarazi Dep., 128-129) The Northeast Controller, Alex Tarazi, was the first at an ABMJ subsidiary to start using biometric timeclocks, and the main reason why was to control ghosting:

> Because unlike other companies where you have a box, a factory, and ... you know who's there and who's not there, in our case the minute our employees punch in, they get dispersed everywhere [e.g., to different floors throughout a skyscraper] and we don't know who's there or not. And sometime we didn't even know before when – with the sign-sheets, who signs in for them. ... Or who – even if you're using a regular keypunch card, we don't know if you have your brother or cousin signing in for you, punching in for you. So we wanted to have as close as possible a system that would verify the existence of the employee. So, this biometric thing presented this with a finger index because it has to be warm. You know – you can't use fake fingers.

(Tarazi Dep., 108, ECF # 137). Where biometric timeclocks were installed, Tarazi "mimic[ed] as much as possible the system that was in effect then with the union. And the union had that 15-minute grace or rounding and the five minutes after. So, I took the exact system. I didn't come up with this. . . I used exactly what the practice was in Manhattan for these rules." (*Id*. at 109). As of the end of September 2012 in the Northeast Super-Region, janitors on electronic

---

[8] A summary of what branches in the Midwest Super-Region utilized electronic timekeeping and rounding rules that were applied before the WFM rollout in the Midwest are attached as an exhibit to the Suerth declaration.

timekeeping (either biometric or IVR) started getting paid to the minute. (*Id.* at 27).

About two-thirds of the janitors in the Northeast, or approximately 12,000 to 14,000, are members of about 26 different unions. (Surace Decl., ¶ 3). Thus, wage, hours and work rules are driven in large part by collective bargaining agreements ("CBAs"). For example, pursuant to the terms of the CBA with Local 32BJ, which covers approximately 3,500 janitors working in New York City, the practice is to pay janitors 8 hours of pay for 7.5 hours of work. (*Id.*). No janitor has filed a grievance in the Northeast claiming that janitors' time has been improperly rounded or that janitors have not been paid for all hours worked. (*Id.* at ¶ 2).[9] No representative from the 26 unions in the Northeast has claimed that janitors' time has been improperly rounded or that janitors have not been paid for all hours worked. (*Id.*). No janitor from the Northeast has opted-in to this case or submitted a declaration in support of this motion.

### C. The Divergent Testimony of Former and Current Janitors.

#### 1. Chicago Area Janitors

Lead Plaintiff Binissia worked a variety of different shifts at several jobsites in Chicago during his tenure with ABMJ. (Binissia Dep. I at 31, 58, attached as Exhibit 10; Binissia Dep. II at 18-19, 33-34, 63, 100, see, ECF 137-3). On average, he arrived to work 10 minutes before his scheduled start time via public transportation. (Binissia Dep. II, 40-41). He admits that other janitors arrived to work before him, some at the same time, and some after. (*Id.* at 61).

In this lawsuit, Binissia seeks compensation for 8 minutes of pre-shift work he claims to have performed each day before the start of his scheduled shift. (*Id.* at 46). Specifically, Binissia claims that, when he worked at 440 South LaSalle, he punched-in on a manual timeclock 10 minutes before his shift start time, retrieved building keys, took the elevator to the twenty-fifth floor where he changed clothes, gathered his work equipment, and then took the

---

[9] Nor has any janitor in North Central, which is also heavily unionized. (Suerth Decl., ¶ 5).

elevator back to the second floor to begin working. (*Id*. at 75-76). He never performed any cleaning work before punching-in. (*Id*. at 127-28). At 427 South LaSalle, however, Binissia used a handwritten timesheet but also claims that he began working before recording his 5:00 p.m. start time on his timesheet. (*Id*. at 35-36, 39-40, 46, 60-61). Binissia has no knowledge regarding other janitors' timekeeping practices. (*Id*. at 113).

Binissia claimed that he was required to work during pre-shift gap time because someone from Human Resources named "Gonzalez" told him on his first day of work to arrive to work "early or on time" to avoid problems. (Binissia Dep. I, at 44-46; Binissia Dep. II, at 22). Binissia admitted, however, that a supervisor instructed him to punch-in at his shift start time, and that same supervisor never instructed him to come to work early. (Binissia Dep. II, at 35, 40).

Named Plaintiff Suchecka currently works the 4:45 p.m. to 12:45 a.m. shift at the 10 South LaSalle jobsite in Chicago. (Suchecka Dep. 37, 48, attached as Exhibit 11). She typically arrives to work by bus 45 minutes early, at 4:00 p.m., and punches-in at 4:35 p.m.—currently on a biometric time clock and previously using a swipe card. (*Id*. at 22-27, 33, 45-46, 56-59). In this lawsuit, Suchecka seeks compensation for 90 minutes of pre-shift work per pay period, or approximately 9 minutes per day for work she claims to have performed before the start of her scheduled shift. (*Id*. at 21-23; Dkt. # 112, ¶ 71). After punching-in, Suchecka retrieves building keys and supplies (i.e., a trash can, water, rags, etc.). (*Id*. at 22, 56-59). Suchecka receives a paid 30-minute meal break each workday, which she always takes, meaning that she only works 7.5 hours of her 8-hour shift. (*Id*. at 64). She arrives in the building basement ten minutes before her shift ends, changes clothes, and then punches-out. (*Id*. at 68-69).

Suchecka has never been told to arrive at work before her shift starts and has never been

instructed to perform work off-the-clock. (Suchecka Dep. 49, 64). Her supervisor told her that she could punch-in up to 30 minutes before her shift started when she recorded her time using a swipe card, although she was not aware of any requirement to punch-in at a time certain during that timeframe. (*Id*. at 53-55). Any work Suchecka may have performed during the gap time between her punch-in and shift start was done entirely of her own volition – not as a result of any directive to begin working immediately after punching-in.

Opt-in deposition testimony demonstrates that janitors decide when to arrive to their jobsites based on reasons that are entirely personal to them. Opt-in Milanka Lucic, who takes the train to work, typically arrives to her building at 4:30 for her 5:00 p.m. shift because she likes to eat before she starts working and she doesn't want to be late. (Lucic Dep. 61, attached as Exhibit 12). She usually sits in a small café with other janitors until about 4:45 p.m. when she leaves to change into her uniform. (*Id*. at 61-65). Opt-in Gabriel Ramirez takes the bus to work and typically arrives to his jobsite between 5:30 and 5:40 p.m for his 6:30 p.m. shift. (Ramirez Dep. 49-50, attached as Exhibit 13). After changing into his work clothes and gathering his keys, he either immediately starts looking for his "gondolas" and other work supplies, or punches in at the time clock and then looks for the supplies because in his experience, janitors who work the earlier shifts are inconsiderate and often don't put these items back in the proper place. (*Id*. at 24-25, 55-57 and 59-60). When opt-in Guy Sutton worked at the Hancock building, he took the train to work typically arriving between 4:15 and 4:30 p.m. for his 5:00 p.m. shift. (Sutton Dep. 58-60, attached as Exhibit 14). He liked to sit in the area near the Cheesecake Factory to relax before his shift, read the news, talk to some of the male janitors and "look at the girls." (*Id*.). Because Sutton chose to wear his uniform to work, all he needed to do to get ready for his shift was to change his shoes. (*Id*.). Opt-in Anna Skalany carpools to work with three other female

janitors who work at the same jobsite. (Skalany Dep. 65-66, 89-90, attached as Exhibit 15). Depending on traffic they arrive at the building and park the car in the building parking garage between 4:30 and 4:45 p.m. (*Id*.). Maria Dron ("Dron") arrives for her shift between 5:45 p.m. and 5:55 p.m., punches-in using a punch card, and waits until her shift start time to start working; when Dron has extra time before her shift start, she reads or relaxes. (Declaration of Maria Dron, ¶ 6, attached as Exhibit 16).

Janitors punch in at varying times based on the practices at their particular jobsites. Evans testified that he punched in on both a manual punch clock and, towards the end of his employment, IVR, at 4:50 a.m. for his 5:00 a.m. shift, and then immediately started gathering his materials. (Evans Dep. 43, 98-99, 101, 115-116, 131, attached as Exhibit 17). According to Evans, a prior supervisor, many years ago, told him to punch in 10 minutes before his scheduled shift time. (*Id*. at 43-44, 51-54, 81). Lucic, who was never instructed to arrive to work before her shift start time, typically punches in between 4:50 and 4:57 p.m. using a punch card. (Lucic Dep. 60-65). Lucic was told by her supervisor to punch in and punch out at the beginning and end of her scheduled shift. (*Id*. at 54). Ramirez punched in for his shift at varying times because he was often searching for his work materials and would often forget to punch in; thus his punch in times range widely from 6:06 to 6:23 p.m. for his 6:30 shift. (Ramirez Dep. 24-25, 55-57, 59-60). Skalany, who was told by her supervisor to punch in between 4:50 and 5:05 p.m. for her 5:00 p.m. shift, typically punches in anytime between 4:52 and 4:57 using a punch card. (Skalany Dep. 55, 65-66, 89-90). In contrast Sutton was told simply that he should arrive early enough to punch in before the start of his 5:00 p.m. shift to gather his supplies and be ready to start working at 5:00 p.m. (Sutton Dep. 58).

Opt-ins work different shifts with varying meal and rest breaks. Lucic works the 5:00

p.m. to 1:30 a.m. shift, where she receives two paid ten minute breaks and one unpaid 30-minute lunch break that she claims to take most days at 9:00 p.m. (Lucic Dep., 87). Evans worked the early morning shift from 5:00 a.m. to 1:30 p.m. because he needed to clean the floors before the mall opened to shoppers each day. (Evans Dep., 60-64). Evans took his 30-minute paid lunch break daily at 10:00 a.m. (*Id.* at 66). Ramirez was the only janitor who worked the 6:30 p.m. to 3:00 a.m. shift at his jobsite (recently changed to 7:00 p.m. to 3:00 p.m.), because 130 E. Randolph is a continuous operation and some janitors are assigned to work staggered shifts in order to provide continuous coverage. (Ramirez Dep. 24-25, 55-57, 59-60, Kljucanin Decl. ¶3). He claims to occasionally work through one of his two ten-minute paid rest breaks. (Ramirez Dep. 25-26, 95-96). For most of the relevant time period, Ramirez had a 30-minute unpaid lunch break which he took regularly. (*Id.*) Sutton worked the 5:00 p.m. to 1:00 a.m. shift at Union Station, and had a 30-minute lunch break that he regularly took on the 25th floor lunch room at either 8:00 or 9:00 p.m. for which he did not have to punch in and out. (Sutton Dep. 58-60). Dron works the 6:00 p.m. to 1:00 a.m. shift at the 111 West Monroe Street in Chicago and receives a paid 30-minute meal break. (Dron Decl. ¶ 6). Karimierz Szyc, who works the 5:00 p.m. to 1:00 a.m. shift at the same jobsite as Dron, waits until the start of his shift to punch-in and begin working and also receives a 30-minute paid meal break. (Declaration of Karimierz Szyc at ¶¶ 3-6, attached as Exhibit 18).[10]

## 2. New York City Janitors

---

[10] In their brief, Plaintiffs make no claim that post-shift activities went uncompensated. Even so, the record shows end of shift activities vary by jobsite. *See, e.g.,* (Lucic Dep., 80-81) (stops working 15 minutes prior to the end of her shift, walks downstairs, changes clothes, and then punches out); (Evans Dep., 124) (typically stopped working at 1:25 p.m. and walked back to the time clock to punch out by 1:30 p.m.); (Ramirez Dep., 74-75)(usually stops working between 2:40 and 2:45 a.m., changes clothes, socializes and then punches-out around 3:00 a.m.).

By comparison, Mariann Irvin ("Irvin") is a daytime cleaner who works the 8:00 a.m. to 5:00 p.m. shift (with a one-hour lunch break) at the 140 Broadway jobsite in New York City. (Declaration of Mariann Irvin, ¶¶ 2-4, attached as Exhibit 19). She arrives to work between 7:30 a.m. and 7:40 a.m. by subway, and punches-in at 7:45 a.m. on a biometric time clock. (*Id.* at ¶¶ 5-6). Irvin then relaxes in the locker room until 8:00 a.m., at which time she signs an attendance sheet, retrieves her building keys and supplies, and begins working. (*Id.* at ¶ 6). She always takes her lunch break and never performs any work after punching-out at 5:00 p.m. (*Id.* at ¶¶ 7-10). Janitors from other New York City jobsites, all of whom receive pay for non-working time, relate similar experiences. (Declaration of Ismet, ¶¶ 4, 8, attached as Exhibit 20; Declaration of Venor Kullashi, ¶¶ 17, 19, attached as Exhibit 21; Declaration of Keith Lovell, ¶¶ 5, 8, attached as Exhibit 22; Declaration of Elvis Mejia, ¶¶ 15-18, attached as Exhibit 23).

## III. LEGAL ANALYSIS

### A. The Legal Principles Governing Plaintiffs' Request for Judicial Intervention.

The FLSA does not expressly authorize the judicial intervention Plaintiffs seek. It simply permits individuals to bring an action for unpaid overtime on behalf of themselves "and other employees similarly situated." 29 U.S.C. § 216(b). Whether this Court intervenes as Plaintiffs request is a matter committed to judicial discretion. In *Hoffman-LaRoche, Inc. v. Sperling*, the Supreme Court held that district courts "have discretion, in appropriate cases . . . to implement" the collective action mechanism under Section 216(b) "by facilitating notice to potential plaintiffs." 493 U.S. 165, 169 (1989) (emphasis added). In support of this conclusion, the Supreme Court pointed to the systemic benefits derived from a process that permits the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged . . . activity." *Id.* at 170, 172-74.

In *Brooks v. Safety-Kleen Sys., Inc.*, 2012 U.S. Dist. LEXIS 117035 *4 (N.D. Ill. Aug. 14,

2012), this Court, citing *Hoffman-La Roche*, noted that:

> district courts have discretion to manage the joinder of additional parties to assure the task is accomplished in an efficient and proper way. While the Seventh Circuit has yet to address how district courts should manage collective actions, courts in this district have commonly applied a two-part test to determine whether an FLSA claim may proceed as a collective action. In the first stage, a court issues a conditional certification of the collective action *if* the plaintiffs show there are similarly situated employees who are potential claimants. At this stage, a plaintiff must make a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law. A modest factual showing requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan. However, the modest factual showing cannot be founded solely on allegations in the complaint. Instead, *plaintiffs must provide some factual support* in the form of affidavits, declarations, deposition testimony or other documents for the allegations that other similarly situated employees were subjected to a common policy.

(internal quotation marks and citations omitted; emphasis added).

Although Plaintiffs emphasize the "leniency" of "notice stage" conditional certification, the modest factual showing requirement "is not a mere formality," *Nogueda v. Granite Masters Inc.*, 2010 U.S. Dist. LEXIS 37657, at *5, (N.D. Ill. April 14, 2010) and certainly is not "a matter of rubber-stamping," *Blakes v. Illinois Bell Tel. Co.*, 2011 U.S. Dist. LEXIS 43147, at *5-6 (N.D. Ill. Apr. 21, 2011). Rather, it serves as an "important and functional step in the certification process." *Adair v. Wisconsin Bell, Inc.*, 2008 U.S. Dist. LEXIS 68942, at *9-11 (E.D. Wis. Sept. 11, 2008). Application of a lenient standard does not prevent this Court from crediting ABMJ's evidence. *See, e.g., Bergman v. Kindred Healthcare, Inc.*, 2013 U.S. Dist. LEXIS 82238 *11 (N.D. Ill. June 11, 2013) ("Both sides' evidentiary submissions will be considered in determining whether there is a group of similarly situated employees who may be discovered by sending out an opt-in notice."). Indeed, plaintiffs must at this stage provide evidence of similarly situated employees "which successfully engage defendants' affidavits to the contrary." *Brooks v.*

*Bellsouth Telecomm. Inc.,* 2009 U.S. Dist. LEXIS 20552, at *31 (N.D. Ga. Feb. 10, 2009) (quoting *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001))*; see also, Blakes*, 2011 U.S. Dist. LEXIS 43147, at *6 (plaintiff must overcome defendant's evidence against certification).

Careful exercise of discretion is imperative because Section 216(b) cases present the opportunity for abuse. *Hoffmann-LaRoche*, 493 U.S. at 171. Indeed, the Seventh Circuit has observed that a plaintiff's discovery demands upon conditional certification impose "a tremendous financial burden to the employer." *Woods v. New York Life Ins. Co.*, 686 F.2d 578, 581 (7th Cir. 1982). "Where the plaintiff has not made at least a modest factual showing that certification is appropriate, it would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated." *Adair, 2008 U.S. Dist. LEXIS 68942,* at *9-11; *accord Powers v. Centennial Commc'ns. Corp.*, 679 F. Supp. 2d 918, 922 (N.D. Ind. 2009) ("Where, as here, there is no evidence that the putative class is similarly situated, allowing for opt-in notification and discovery throws a huge burden upon defendants without any indication that the goals of the collective action mechanism are likely to be met."); *Saleen v. Waste Mgm't., Inc.*, 2009 U.S. Dist. LEXIS 49891 *28 (D. Minn. June 15, 2009); *aff'd* 649 F. Supp. 2d 937 (D. Minn. 2009) ("but [*Hoffman-LaRoche's*] focus does not mandate that district courts send out notice when it appears that an FLSA case will be unmanageable as a collective action.").

Two recent Supreme Court decisions enunciate principles that must be taken into account in assessing Plaintiffs' motion: *Dukes v. Wal-Mart Stores, Inc.*, ___ U.S. ___, 131 S. Ct. 2541 (2011), and *Comcast Corp. v. Behrend,* ___ U.S. ___, 133 S. Ct. 1426 (2013). While both were

decided under Federal Rule 23, the Seventh Circuit Court of Appeals has recognized that there is no meaningful distinction between the standards used to certify a "class" under Rule 23 and a "collective" under Section 216(b). *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) ("there isn't a good reason to have different standards for the certification of the two different types of action [under Rule 23 and the FLSA], and the case law has largely merged the standards[.]"); *accord Clark v. Honey—Jam Café, LLC*, 2013 U.S. Dist. LEXIS 62461 *7 (N.D. Ill. Mar. 21, 2013) (recognizing that "[f]or purposes of determining certification of a collective action and a class action in a single suit, the Court applies the same standard for certification of both types of cases."); *see also, Vang v. Kohler Co.*, 488 Fed. Appx. 146, (7th Cir. 2012).

*Dukes* is instructive in assessing the commonality question that exists in both FLSA collective actions and Rule 23 class actions, namely, "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 131 S. Ct. at 2551 (citation omitted). Recently, the Supreme Court extended *Dukes'* rationale in concluding that class certification also requires that damages be susceptible of measurement on a classwide basis. *Comcast*, 133 S. Ct. at 1433-35.

Plaintiffs' request for judicial intervention, therefore, must be analyzed to determine whether the specific "violation of law" upon which they base their claims for overtime pay – and the claims of all other potential opt-in plaintiffs – can conceivably be resolved with respect to both liability and damages on a representational basis consistent with these principles. *See, Boelk v. AT&T Teleholdings, Inc.*, 2013 U.S. Dist. LEXIS 20606 *38-41 (W.D. Wis. Jan. 10, 2013) (declining to conditionally certify a collective action based on *Dukes*); *Ruiz v. Serco, Inc.*, 2011 U.S. Dist. LEXIS 91215 *18-19 (W.D. Wis. Aug. 5, 2011) (same).

**B.  Notice To Tens of Thousands of Employees Is Inappropriate Where Plaintiffs Have Failed To Make Even A Modest Factual Showing Of A Systemic Policy that Routinely and Uniformly Deprives All Janitors of Pre-Shift Wages.**

**1.  Plaintiffs cannot root their claims in ABMJ's "rounding practice."**

Plaintiffs' motion should be denied because they have failed to make a showing that they and 60,000 other janitors "together were victims of a common policy or plan that violated the law." *Strait v. Belcan Eng'g Group, Inc.*, 911 F. Supp. 2d 709, 718 (N.D. Ill. 2012) (internal quotations and citations omitted) (denying plaintiffs' motion for conditional collective-action certification after substantial discovery had been taken). "[T]he practice of rounding is expressly approved by the FLSA regulations so long as it is used in a manner that does not result, over a period of time, in failure to compensate employees for all of the time they have worked." *Adair*, 2008 U.S. Dist. LEXIS 68942 at *30 (citing 29 C.F.R. § 785.48(b)). Only "[a] rounding policy or practice that consistently resulted in a rounding down of hours would likely violate the FLSA[,]" and then only if "an employee actually lost overtime or minimum wages as a result of" rounding. *McElmurry v. US Bank Nat'l Assoc.*, 2004 U.S. Dist. LEXIS 15233 *42-47 (D. Or. July 27, 2004) (declining to conditionally certify a collective action where "the similarly situated determination in terms of actual wage loss requires individual employee-by-employee, timesheet-by-timesheet inquiries which are inconsistent with a collective action's goal of promoting judicial efficiency."). Indeed, as the Secretary of Labor recognizes: "[i]n those cases where time clocks are used, employees who voluntarily come in before the regular starting time or remain after their closing time, do not have to be paid for such periods provided, of course, that they do not engage in any work." 29 C.F.R. § 785.48.

As this authority makes clear, janitors must perform compensable work during gap times that are "rounded-away" to implicate a FLSA violation, and even then there is no violation if

those same janitors equally benefit from a "rounding practice."  Here, although Plaintiffs ambushed Defendants with an expert report that was disclosed for the first time when attached to their brief,[11] that report actually supports the denial of Plaintiffs' motion.  After all, the expert opines that, for the states of "OH, KY, VA and MA," the rounding was "less than 2 minutes, which indicates that the rounding for the employees at these particular locations within these states *was not materially different from the actual times*."  (ECF # 139-2, at 7) (emphasis added). Moreover, the best the expert can say about the time records he examined for janitors in Connecticut, Pennsylvania, Maryland and New York is that the records "warrant further investigation."  Such wishful thinking is not a factual showing and provides no basis for the Court to send notice to tens of thousands.  *See, Dreyer v. Altchem Envtl. Servs.*, 2006 U.S. Dist. LEXIS 93846, at *7 (D.N.J. Dec. 12, 2006) (a modest factual showing that the putative class have suffered the same injury is required to prevent costly "class action fishing expeditions.").

> ### 2. Plaintiffs have not made a factual showing of a corporate policy that uniformly requires uncompensated pre-shift gap time work of all janitors across 27 states.

Numerous courts have concluded that allegations of uncompensated work premised on time-clock rounding do not lend themselves to common proof.  For example, in affirming the district court's denial of certification in a case in which plaintiffs pursued the same theory as is being pursued here, the Eleventh Circuit held:

> Here, the district court reasonably concluded that punch clock records do not provide common proof of any uncompensated work during gap periods – particularly in light of employee testimony regarding the various non-work-related activities that took place during the gap periods and the various personal reasons that employees listed for coming in early and staying late.

---

[11] Plaintiffs failed to comply with Federal Rule 26(a)(2) and disclose their "expert" before filing his report with their conditional certification brief.  Accordingly, Defendants reserve the right to move to strike the expert and his report at a later time.

* * *

Pursuant to [29 C.F.R. § 785.48(a)], it would appear that the court would still have to conduct individualized inquiries into whether each employee voluntarily arrived early or stayed late and whether he engaged in any work.

*Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1192-93 (11th Cir. 2009); *Masterson v. Fed. Express Corp.*, 269 F.R.D. 439, 444-45 (M.D. Pa. 2010) (same); *Merlo v. Fed. Express Corp.*, 2010 U.S. Dist. LEXIS 56108 *27-28 (S.D. Fla. June 7, 2010) (same)*; see also, Cornn v. United Parcel Serv., Inc.*, 2005 U.S. Dist. LEXIS 30419 *16-17 (N.D. Cal. Aug. 26, 2005) ("Because the Court cannot determine whether a driver performed work during the interval in question without undertaking individualized inquiries that predominate over any common questions, class certification would be inappropriate."); *Thompson v. Speedway SuperAmerica*, 2008 U.S. Dist. LEXIS 115050 (D. Minn. Aug. 21, 2008), *adopted by* 2009 U.S. Dist. LEXIS 3816 (D. Minn. Jan. 20, 2009) (rejecting motion to conditionally certify a class of employees who argued "that their time cards only reflected their scheduled hours, rather than the time they actually spent working[.]").

Courts in this district have likewise declined to certify wage-and-hour claims, under both Section 216(b) and Rule 23, in the absence of a common policy or plan requiring off-the-clock work. *See, Smith v. Family Video Movie Club, Inc.*, 2013 U.S. Dist. LEXIS 54512 *26-32 (N.D. Ill. Apr. 15, 2013) (citing *Boelk*, 2013 U.S. Dist. LEXIS 20606 at *10); *Franks v. MKM Oil, Inc.*, 2012 U.S. Dist. LEXIS 128205 *30-32 (N.D. Ill. Sep. 7, 2012).[12]

Plaintiffs have made no *factual showing* of a policy that violated the law in the Northeast

---

[12] Although some courts in the Northern District of Illinois previously concluded that Rule 23 cases were not "particularly instructive" in the FLSA conditional collective action context, *see, e.g., Nehmelman v. Penn Nat'l Gaming, Inc.*, 822 F. Supp. 2d 745, 754-55 (N.D. Ill. 2011), these cases were decided before the Seventh Circuit's harmonization of the Rule 23 and Section 216(b) standards in *Espenscheid*.

Super-Region. Plaintiffs have submitted no testimony from any janitors from the Northeast—either by deposition or declaration—attesting that they performed any work before the start of their scheduled shift for which they were not compensated. No janitor from the Northeast has opted-in to this case. Plaintiffs have presented no documents applicable to all janitors in the Northeast that even hint of a requirement to perform work before the start of their scheduled shift. All that Plaintiffs have presented is evidence that some jobsites in the Northeast had electronic timekeeping that originally allowed janitors a grace period to punch-in at the start of their scheduled shift consistent with what had been agreed-upon with the union. (Tarazi Dep., 61-62, 109). That some janitors may have punched in before the start of their scheduled shift by a few minutes and were paid from the start of their shift says nothing about whether those janitors performed any compensable work during such pre-shift gap time, and the experiences of janitors in Chicago who worked at different jobsites under different supervisors cannot speak to the experiences of 33,000 janitors from the Northeast.[13] *See, e.g., Collazo v. Forefront Educ., Inc.*, 2010 U.S. Dist. LEXIS 7661 *6-7 (N.D. Ill. Jan. 28, 2010) (concluding it would be "improper" to "speculate" that Florida employees were denied overtime pay based on Illinois' employees testimony).

With regard to North Central, Plaintiffs' evidence, when put into context, is remarkably thin. Plaintiffs have offered no evidence from any janitors in the states of Michigan, Indiana,

---

[13] Plaintiffs' reliance on the US Department of Labor's investigation at the Philadelphia airport last year is misplaced because that evidence actually accentuates differences not only between janitors at that airport but also between janitors at the Philadelphia airport and the named Plaintiffs and other opt-ins here. After all, the USDOL demanded backpay for only 21 out of 150 janitors at the Philadelphia airport (*see*, Brad Neilley Decl., ¶ 3, attached as Exhibit 24), indicating that 129 janitors did not present the same issue as the 21 who received backpay. Moreover, the issue at the Philadelphia airport—how long it took to walk to another building after punching-in—is not an issue that any declarant or deponent in this case has identified, demonstrating a lack of similarity.

Ohio, Kentucky, Wisconsin, Missouri, Kansas, Nebraska, North Dakota, South Dakota, Minnesota or Iowa attesting that they performed work before the start of their scheduled shift for which they were not compensated. *Demarco v. Northwestern Memorial Healthcare*, 2011 U.S.Dist. LEXIS 88651, *7 (N.D.Ill. 2011) ("The court may narrow the lead plaintiff's proposed opt-in class where the first-stage evidence provides no tangible support for including certain employees in the class."). No janitor from these states has opted-in to this case. Rather, Plaintiffs have offered 94 declarations from Chicago-area janitors only out of a potential class from the North Central Super-Region of over 30,000, or no more than 0.3%. *See Espenscheid, supra* ("To extrapolate from the experience of the 42 to that of the 2341 would require that all 2341 have done roughly the same amount of work, including the same amount of overtime work, and had been paid the same wage. No one thinks there was such uniformity") (citation omitted); *Thompson, supra* (denying conditional certification where plaintiff presented evidence from less than 1% of the putative class); *Smith v. Family Video Movie Club*, 2013 U.S.Dist. LEXIS 54512, *20 (N.D. Ill. 2013) ("declarations from less than one quarter of one percent of the proposed class do not provide the Court with a sufficient basis to conclude that Plaintiffs' claims are common to the entire proposed class").

Further, Plaintiffs grossly distort a June 28, 2012 memo to the Midwest Region Branch Operations to argue that this memo establishes a policy of requiring off-the-clock work. (ECF # 142, submitted *in camera*). A complete reading of that memo demonstrates that North Central Super-Region policy has and continues to be to forbid off-the-clock work and to ensure that janitors are paid for all hours worked, whether it is pre- or post-shift. (*Id.*) After all, the memo begins by announcing that the Midwest was "moving to a new electronic timekeeping system called Workforce Management" under which "[e]mployees will be required to punch in and

punch out *at the start* and end of their shifts" and that "employees will be *paid to the punch* ..." (*Id*. at 1) (emphasis added). It also reiterates policies that had previously been in effect, including that: "Employees must be paid for all hours that they actually work, regardless of the schedule or budget. If the employee works the hours, the employee must be paid;" "[d]o not allow employees to perform any work before punching in or after punching out;" and "[i]nstruct employees that they must perform all beginning-of-shift activities after they punch in." (*Id*. at 1-3). *See, Family Video,* 2013 U.S. Dist. LEXIS 54512, *20 (rejecting plaintiffs' interpretation of "Family Video's Payroll and Overtime Policies and Practices" as pressuring employees to perform off-the-clock work).

The declarations that Plaintiffs attached to their brief likewise fail to demonstrate the existence of a policy to require uncompensated pre-shift gap time work. For example, the cookie-cutter declarations that were part of Plaintiffs' Exhibit 19, (ECF # 140), say that the declarants "would regularly punch-in before the start of my scheduled shift" and that they would immediately get their cleaning supplies after punching-in. But none of these declarations say how long before the start of their scheduled shift the janitor would punch-in. Nor do they speak to the experiences of janitors at the thousands of other jobsites in the North Central Super-Region. *See Boyd v. Alutiiq Global Solutions*, 2011 U.S.Dist. LEXIS 88656, * (N.D.Ill. 2011) (denying conditional certification where plaintiffs' declarations indicated lack of personal knowledge of circumstances at other locations). Moreover, since Plaintiffs allege that all janitors are similarly situated to one another in this case, then this Court could reasonably conclude that the janitors who signed the declarations attached to Plaintiffs' brief are similarly situated to the janitors whom Plaintiffs' expert concedes did not have their time materially rounded. Or, the Court could reasonably conclude that Plaintiffs' declarants are similarly situated to the janitors

who work at 71 South Wacker and who punched-in and out exactly eight hours apart. In sum, the evidence does not support the conclusion of the existence of a uniform policy requiring pre-shift gap time work in the North Central Super-Region. [14]

### C. Plaintiffs' Claims are Incapable of Proof Via Representative Evidence, which Undermines the Core Efficiencies Section 216(b) is Designed to Achieve.

In the absence of a common policy or plan that compelled all janitors to work off-the-clock, the Court is left with a mismash of individualized grievances. This Court must determine whether these grievances can be extrapolated across the class, such that Binissia can testify on behalf of a janitor in New York or Massachusetts (and vice versa). Extrapolation is impossible here. Adjudicating each janitor's FLSA claim will require resolution, on an individual-by-individual basis, of many interrelated factual and legal questions.

### 1. Separate proof is necessary to establish whether, why and how much janitors performed work outside of their scheduled shifts.

First and foremost, Plaintiffs have not demonstrated how they could ever prove that all janitors performed uncompensated pre-shift gap time work using representative proof. Plaintiffs' reliance on a comparison of rounded times in and out to actual times in and out utterly begs the question of what the janitors were doing during time increments that were "rounded-away." *See,*

---

[14] At most, Plaintiffs' evidence suggests that two supervisors at three Chicago Branch jobsites (111 East Wacker Drive, 233 North Michigan Avenue, and 155 North Michigan Avenue) fostered an unwritten policy that violated ABMJ's written policy mandating pay for all working hours. (Declaration of Marlin Hunt, ¶ 8, ECF # 138-1; Declaration of Antoni Chmenia, ¶ 7, ECF # 138-2). This evidence cannot be the basis for sending notice to 60,000+ janitors. *See, Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 444 (S.D. Ind. 2012) (denying certification because "at best, the evidence shows that certain supervisors may have instructed their charges [to perform pre- and post-shift work] and, therefore, plaintiff's evidence does not establish a policy or practice of requiring [hourly employees] to perform pre- and post- shift work without compensation"); *Slayton v. Iowa College Acquisition Corp.*, 2010 U.S. Dist. LEXIS 106643 (N.D. Ill. Oct. 5, 2010) (denying class certification where different managers handled issues differently and plaintiff could not identify which managers and how many caused hourly employees to be underpaid; "[g]iven this lack of detail, it is difficult to conclude from [plaintiff's] statement that defendant had a widespread practice of directing employees not to record time spent working before their scheduled start time").

*Martinez v. Regency Janitorial Servs., Inc.*, 2012 U.S. Dist. LEXIS 5941 *7-10 (E.D. Wis. Jan. 26, 2012) (concluding that plaintiffs' pay statements alone did not demonstrate that defendant failed to pay for overtime); *Babineau,* 576 F.3d 1192-93*; Masterson,* 269 F.R.D. 439, 444-45*, Merlo,* 2010 U.S. Dist. LEXIS 56108, *27-28*, Cornn,* 2005 U.S. Dist. LEXIS 30419, *16-17 (concluding that individualized questions predominate in gap time cases). No amount of expert analysis of time punch data can answer the question of what a janitor did during gap time. Moreover, "[n]ot all work-related activities constitute 'work' that must be compensated." *Munsch v. Domtar Indus., Inc.*, 587 F.3d 857, 859 (7th Cir. 2009). Only those activities that are "integral and indispensable" to an employee's "principal activity" are compensable under the FLSA and is a fact-intensive inquiry. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005); *Nichols v. City of Chicago*, 789 F. Supp. 1438, 1441-42 (N.D. Ill. 1992).

Here, the evidence is all over the map of what possibly compensable pre-shift work was performed. Some janitors (from the Midwest only) claim that they retrieved equipment and supplies after punching-in but before the start of their scheduled shift. (Suchecka Dep., 22, 56-59, Evans Dep., 100; Binissia Dep. II, 75-76). Binissia claims he used part of this "gap" time to change clothes. (Binissia Dep. II, 75-76). Ramirez claims he spent this "gap" time looking for his work equipment. (Ramirez Dep., 24-25, 55-57). Lucic claims she normally spent this "gap" time picking-up keys adjacent to the time clock and walking to her assigned floor; she also picked-up garbage bags during this "gap" time one day per week. (Lucic Dep.m 69-70). The compensability of these varying tasks is questionable, at best. *See, e.g., Pirant v. U.S. Postal Serv.*, 542 F.3d 202, 208 (7th Cir. 2008) (donning and doffing of a uniform shirt, gloves, and work boots is not "integral and indispensable"); *Tum v. Barber Foods,* 331 F.3d 1, 6 (1st Cir. 2003) ("[T]ime spent walking to gather gear before punching in, walking to the time clocks, and

walking to dispose of gear after punching out falls under the Portal-to-Portal Act as preliminary and postliminary activity."). There is no way Defendants could defend against the claims of Lucic, whose only apparent off-the-clock post-punch task is retrieving keys, by examining Binissia, who claims he rinsed mops before recording his start time (Binissia Dep. II, 46, 60-61); *see also, Espenscheid*, 705 F.3d at 773-74 ("Variance would also result from different technicians' doing different tasks[.]").

Second, the record shows different janitors claiming a different amount of uncompensated pre-shift time. While Binissia claims 8 minutes of uncompensated work during pre-shift gap time and Sucheka claims 9 minutes, they clearly are not similarly situated to the janitors in the four states where the expert concedes no material rounding occurred. (*Compare* Binissia Dep. II, 46, 75-76 and Suchecka Dep. 22-27, 33, 45-46, 56-59, *with* Irvin Decl. ¶¶ 5-6; Dron Decl. ¶¶ 4-6; Szwab Decl. ¶ 3; Dachowski Decl. ¶ 4). In contrast, Evans, and Lucic want a full 10 minutes per day; while Ramirez says it took him up to 15-20 minutes to find his trash "gondolas." (Binissia Dep. II, 46, 75-76; Suchecka Dep., 22, 56-59; Lucic Dep., 61-65. 69-70, 82-83; Evans Dep. 101-103). Further, Janitors at the CBOT, where a 30-minute pre-shift rounding rule was in effect, potentially have different claims than janitors at Metra, where a 15-minute rounding was in effect. *See, Espenscheid*, 705 F.3d at 774 ("But what can't support an inference about the work time of thousands of workers is evidence of the experience of a small, unrepresentative sample of them").[15]

Third, the pre-shift procedures for clocking-in vary from job to job—the procedure that

---

[15] This is not a case where every putative class member is spending about the same amount of time doing the same thing before clocking-in such as donning the same personal protective equipment, which is one reason why *Brooks v. Safety-Kleen,* 2012 U.S. Dist. LEXIS 117035 is distinguishable here. Moreover, *Brooks* concerned donning and doffing at one jobsite, whereas thousands of different jobsites in 27 different states with different timekeeping methods and procedures are at issue in this case.

an individual janitor in Omaha follows to punch-in at a small branch office that he will clean by himself is much different from the punch-in procedure followed by multiple janitors who all work the same shift to clean a tall office building in Chicago. Obviously, the Omaha experience cannot be extrapolated to the Chicago experience.

Fourth, it is undisputed that supervisors complete payroll upload reports of the times recorded on sign-in sheets and punch cards; i.e., the on-site supervisors are the ones who individually manage pre-shift procedures and individually determine from the sign-in sheets and punch cards how many hours the janitor will be paid. Thus, while Marlin Hunt claims that she instructed the janitors working at her three jobsites to punch in ten minutes before their scheduled shifts (Hunt Dep., 47-78, attached as Exhibit 25), Dachowski manages her crew to punch-in and out exactly eight hours apart and pays them for eight hours. (Dachowski Decl., ¶ 6). The individual tendencies and proclivities of each on-site supervisor at thousands of different job sites across 27 states are potentially outcome determinative but are incapable of allowing a jury to arrive at a common answer on liability or damages for a class of janitors. *See, Comcast*, 133 S.Ct. at 1433 (damages model must be "susceptible of measurement across the entire class").

Finally, Plaintiffs present no unified theory as to *why* they believed they were required to punch-in early and work for free. Binissia gleaned this understanding from a Human Resources employee who told him on his first day of employment to arrive "early or on time"; Suchecka and Lucic were never told they should punch-in early or work before the start of their shift; Ramirez claims a supervisor told him to punch-in 15 minutes early 10 years ago; and, according to Evans, a former supervisor (outside the limitations period) instructed him to punch-in 10 minutes early and start working immediately. (Binissia Dep. I, 44-46, Binissia Dep. II, 22; Suchecka Dep., 49, 64; Lucic Dep., at 54-60; Ramirez Dep., 58-59; Evans Dep., 43-44, 51-54,

81). This question demands a uniform answer, because it relates directly to ABMJ's liability to each janitor. *See, Espenscheid*, 705 F.3d at 774 (recognizing "the further complication" of distinguishing "benign underreporting from unlawful conduct"). The substantial evidentiary record developed to date demonstrates that Plaintiffs cannot—now or in the future—establish across-the-board off-the-clock FLSA violations that ABMJ sanctioned, acquiesced to, or ratified. No amount of class discovery can reshape this reality.

### 2. Separate proof is necessary to establish whether ABMJ is entitled to offset paid non-working time against unpaid pre-shift working time.

Defendants have a strong offset argument in this case for many janitors. The FLSA requires overtime pay for hours worked in excess of 40 in a week. Janitors who work 7.5 hours/day but are paid for eight hours/day are scheduled to work only 37.5 hours/week. Accordingly, these janitors need to show that they worked more than 2.5 hours (or 180 minutes) off-the-clock each week before they can have a viable overtime claim. Named Plaintiff Sucheka claims 45 minutes of uncompensated pre-shift gap time per week. (ECF # 112, ¶71). She, however, is scheduled for eight-hour shifts, always takes her half hour paid lunch and thus admits that she works 7.5 hours but is paid for eight. The 45 minutes of uncompensated pre-shift gap time that she claims in this case does not get her over the 40 hour per week mark and, therefore, she likely has no overtime claim at all. *See, e.g., Kasten v. Saint-Gobain Performance Plastics Corp.*, 556 F. Supp. 2d 941, 953 (W.D. Wis. June 2, 2008) ("[W]hen an employer pays an employee for time not otherwise compensable under the FLSA, the employer is entitled to an offset for compensation due under the statute."); *Barefield v. Vill. of Winnetka*, 81 F.3d 704, 710 (7th Cir. 1996) (applying the "predominant benefits test" in concluding that the defendant "may properly offset the [paid] meal break against the compensable [unpaid] roll call time worked by plaintiffs."); *Smith v. Safety-Kleen Sys., Inc.*, 2012 U.S. Dist. LEXIS 5908 *16 (N.D. Ill. Jan. 18,

2012) ("Paid meal breaks may offset unpaid compensable time if the meal times are not 'work.'").  The same analysis would apply to the roughly 3,500 New York City janitors covered by the CBA with Local 32BJ who receive 8-hours of pay for 7.5 hours of work.  (Surace Decl., ¶ 3; *see also,* Gashi Decl., ¶ 4; Lovell Decl., ¶ 5; Mejia Decl., ¶¶ 15-16; Declaration of Daniel Morales ¶ 3, attached as Exhibit 26).  In contrast, opt-in Milanka Lucic is scheduled for 8.5 hour shifts and claims to work through her unpaid meal break one to two times per week.  Thus, Defendants have a stronger offset defense against Sucheka and those covered by the 32BJ CBA in New York than they do against Lucic.  Clearly, the offset analysis can only be done on a case-by-case basis of janitors' schedules and breaks.

### 3. Separate proof is necessary to establish whether ABMJ's "rounding practice" benefited janitors or worked to their detriment.

Finally, Plaintiffs' own evidence demonstrates why separate proof will be required to determine whether ABMJ's "rounding practice" benefited or worked to the detriment of each janitor, or had a net neutral effect.  For example, Plaintiffs' "expert" report reflects that janitors were paid for all of their actual punch times, or were paid *more* than their actual punch times, on *61.3%* of the workdays sampled.  (*See,* ECF # 139-2, 7-8).  That means these same janitors' punch times exceeded their rounded times only 38.7% of the time.  *See, Adair,* 2008 U.S. Dist. LEXIS 68942 at *30 ("[T]he practice of rounding is expressly approved by the FLSA regulations so long as it is used in a manner that does not result, over a period of time, in failure to compensate employees for all of the time they have worked.").  Plaintiffs' "expert" further opines that ABMJ's "rounding practice" **has not materially affected** janitors in Ohio, Kentucky, Virginia, and Massachusetts – yet Plaintiffs wish to invite these same janitors to join in their collective.  (*See,* ECF # 139-2, at 7).[16]

---

[16] Due to space constraints and the strong belief that notice should not issue in this case,

## IV.    CONCLUSION

Plaintiffs' motion for conditional collective action certification should be denied. Binissia and Suchecka may continue on with their own claims, but the opt-ins must be dismissed and left to pursue their personal grievances alone.

Respectfully submitted,


/s/ James J. Oh

James J. Oh,
*One of The Attorneys for Defendants*


James J. Oh
Stephanie Seay Kelly
LITTLER MENDELSON, P.C.
A Professional Corporation
321 North Clark Street, Suite 1000
Chicago, IL  60654
312.372.5520

Andrew J. Voss
LITTLER MENDELSON, P.C.
A Professional Corporation
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402

---

Defendants do not fully address the notice process arguments that Plaintiffs make in their brief. If, however, the Court decides that notice should issue in some scope, Defendants respectfully request to be able to submit a short memorandum addressing notice issues, including, but not limited to, the following: whether notice should be facilitated by a neutral third-party administrator, *see, e.g., Kelly v. Bank of Am., N.A.*, Case No. 10 C 5332, ECF # 151 (N.D. Ill. Sep. 23, 2011) (authorizing use of a third-party notice administrator) (attached as Exhibit 27); whether telephone numbers and email addresses for those would receive notice should be produced, *see, e.g., Martinez v. Cargill Meat Solutions*, 265 F.R.D. 490, 501 (D. Neb. 2009) (denying request for telephone and social security numbers, collecting cases); what parameters should be set on the manner in which names and addresses may be used; *see, e.g., Hipp v. Liberty Nat'l Life Ins. Co*., 164 F.R.D. 574, 576 (M.D. Fla. 1996) (authorizing use of employee addresses for purposes of issuing written notice on one occasion, and stating that "any other communication between the Plaintiffs or their counsel and these sought after parties is strictly prohibited[.]"); whether ABMJ must post notice of the lawsuit "by the time clocks in the buildings where the proposed class members work.")  (ECF # 136, at 29).

612.630.1000

**Dated:  August 23, 2013**

## CERTIFICATE OF SERVICE

I, James J. Oh, an attorney for Defendants, certify that on August 23, 2013, I caused the foregoing *DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CONDITIONAL CERTIFICATION* to be filed electronically. This document was served by the Court's CM/ECF system on all individuals listed on the electronic filing receipt. Parties may access this filing through the Court's system.

Thomas M. Ryan
Law Office of Thomas M. Ryan
35 E. Wacker Drive, Suite 650
Chicago, Illinois 60601
tom@tomryanlaw.com

Glen J. Dunn
Glen J. Dunn & Associates, Ltd.
221 North LaSalle Street
Suite 1414
Chicago, Illinois 60601
gdunn@gjdlaw.com

_____/s/ James J. Oh_____
James J. Oh

Firmwide:122431782.6 068757.1035

-32-