# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| BRICE IKBY BINISSIA and HALINA SUCHECKA, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 13 cv 1230 |
| v. | ) ) | Case No. 15 cv 6729 |
| ABM INDUSTRIES, INC., et al., | ) ) | Consolidated for Purposes |
| Defendants. | ) ) | of Settlement |
| | ) ) | Judge Joan B. Gottschall |
| VERONICA BROWN, individually and behalf of all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ABM INDUSTRIES, INC., et al., | ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

The court consolidated these two Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, collective actions after the parties announced that they had reached a global settlement agreement in principle.[1] (Minute Entry, Sept. 27, 2016, ECF No. 462 (granting unopposed motion to consolidate "for the purposes of settlement").) About two months later, the parties jointly moved for approval of their proposed settlement agreement and notice to opt-in plaintiffs.

The court has ordered the parties to submit two rounds of supplemental evidence and briefing focusing on the amount earmarked by the proposed settlement agreement to pay

---

[1] Except where stated otherwise, citations to the docket refer to *Binissia v. ABM Industries, Inc. et al.*, No. 13 cv 1230. References to filings in *Brown v. ABM Industries, Inc. et al.*, No. 15 cv 6729, will be cited using the form "*Brown*, ECF No. ---.").

plaintiffs' attorneys. Though the court finds the proportion of attorneys' fees to employee recovery concerning, it approves the settlement primarily because a very similar settlement has been approved in related litigation.

## I. BACKGROUND

These two cases, *Binissia* and *Brown*, *see supra* note 1, mark the next chapters in the FLSA litigation begun in *Las v. ABM Industries, Inc. et al.*, No. 11 cv 5644 (N.D. Ill.). The named plaintiffs in *Las* made allegations similar to those made in the consolidated cases; they sued on behalf of themselves and a group of allegedly similarly situated Illinois janitors. The case settled during discovery, and 1,949 janitors submitted timely claim forms. (Order Granting Final Approval of Class Settlement ¶ 13 ("*Las* Approval Order"), *Las v. ABM Indus. Inc.*, No. 11 cv 5644, ECF No. 88 (N.D. Ill. Oct. 17, 2012).) The claims administrator also received about 200 late claims forms, but ABM declined to pay them under the settlement. (Mem. Supp. Mot. Approval 1, ECF No. 474.) Members of that group of janitors then initiated the *Binissia* litigation in February 2013. (*Id.*)

In sum, 6,193 janitors have opted into the consolidated cases as plaintiffs. Like the plaintiffs in *Las*, they allege that the defendants violated the FLSA by not paying them overtime wages earned for the minutes spent gathering supplies and loading their cleaning carts before the start of their scheduled shifts. Plaintiffs further allege that the defendants used an unfair rounding system that ensured that janitors who clocked in before the start of their shifts did not get paid for pre-shift work. The plaintiffs in *Binissia* used an electronic system to record their time while the *Brown* plaintiffs used handwritten timesheets.

Unlike the *Las* class, the classes in these cases cover more than one state, and more employees have opted into these cases. The settlement class approved by Judge Nordberg in

*Las* consisted of Illinois janitors only. (*See Las* Approval Order ¶ 3 (defining class to include Illinois janitors employed by ABM from Apr. 6, 2008–Jan. 7, 2012).) In these cases, by contrast, this court conditionally certified an opt-in class in *Binissia* on February 26, 2014, consisting of janitors in ABM's north central or northeast regions during the relevant time period.[2] After conducting initial discovery, the parties in *Brown* stipulated to sending notice to a putative national class of janitors who recorded their hours exclusively on handwritten timesheets. (*See* Stipulation ¶ 4, *Brown*, ECF No. 75-1; *see also Brown*, ECF No. 78 (granting motion to approve stipulation and conditionally authorizing notice to putative class members).)

The certification of more geographically diverse classes in these cases has resulted in more costly and complex litigation. The record shows, for instance, that counsel took sixty-seven fact witness depositions in *Binissia* and that over 400,000 pages of documents were produced. (Mem. Supp. Mot. Approval 6, ECF No. 474.) The class members worked at over 10,000 different locations under different supervisors under forty-five separate collective bargaining agreements. (*Id.* at 2–3.) Based on all of this, plaintiffs' counsel considers full or partial decertification to be a substantial risk.

---

[2] The conditionally certified class in *Binissia* is defined as:
> All individuals who were or are currently employed by the Defendants, their subsidiaries, affiliates, predecessors and/or successors, as janitors, or their functional equivalent , at any time during the relevant statute of limitations, and who used punch cards and/or electronic timekeeping methods to record time worked during the workweek and whose clock in and out times were rounded to their detriment.

(Mot. for Conditional Certification 1–2, ECF No. 106 (incorporated by reference in Order granting motion, ECF No. 176).)
In their memorandum in support of approval of the class settlement, the plaintiffs define the class as:
> All janitors (or employees performing similar duties) employed by Defendants from February 14, 2010 to the present who: (i) are, or were, employed in Defendants' North Central or Northeast regions; (ii) had clock-in and clock-out times recorded electronically or with a punch card on a time clock; and (iii) for one or more work weeks was paid forty hours at their regular rate of pay.

(Mem. Supp. Mot. Approval 5–6, ECF No. 474.)

### A. The Proposed Settlement

The parties claim that "[t]his is not a common fund" case. (Mem. Supp. Mot. Approval 7, ECF 474.) The proposed settlement allocates $1,011,236.59 to gross wage payments. They seek $3,463,763.41 in attorneys' fees, plus reimbursement of $325,000.01. Each opt-in plaintiff receives a fixed amount for each rounded work week. (*See* Mem. Supp. Mot. Approval 7–8.) For work weeks with between 40 and 42.5 hours, the employee receives $2.47. For work weeks with more than 42.5 hours, the employee receives $4.93. *See id.* The difference, explain the parties, results from ABM's possible set-off defense. Some, but not all, potential opt-in class members took thirty-minute meal breaks; if ABM is entitled to a set-off for five, thirty-minute breaks a week, up to 2.5 hours of uncompensated time per week would be effectively cancelled. (*Id.* at 19.)

The parties base their figures on a representative sampling of the class. (*See id.* at 7.) On average, each employee earned approximately $12 per hour and worked approximately 12 minutes a day preparing cleaning supplies and doing other arguably compensable work. At time-and-a-half, that works out to $18 per week. (*See id.* at 22.) So the $2.47 per week settlement amount comes out to 13.7% of the employee's maximum liquidated claim, and the $4.93 comprises 27% of the theoretical $18 liquidated claim.

As this court has previously observed (April Briefing Order 4, ECF No. 487), class members receive 13% or 27% of their maximum liquidated claim, and class counsel earn 50% of their fees, netting 76% of the total amount paid under the proposed settlement agreement.

### B. Proceedings After the Motion for Approval

On December 21, 2016, this Court directed the parties to amend the proposed Settlement Agreement to include an option for class members to object to the terms of the settlement. (ECF

4

No. 476.) They have amended their proposed settlement agreement accordingly. On January 5, 2017, this court ordered the plaintiffs to provide more detailed information documenting plaintiffs' claimed attorneys' fees. (ECF No. 478.) In April 2017, the court directed the parties to brief whether common fund principles applicable in Federal Rule of Civil Procedure 23 class approval proceedings had any bearing on whether the proposed settlement should be approved. (ECF No. 487.) The parties submitted a supplemental memorandum of law and accompanying exhibits on April 26, 2017. (ECF No. 491-1.)

**II. APPROVAL OF SETTLEMENTS OF FLSA COLLECTIVE ACTIONS**

To approve an FLSA settlement, the court must find that the settlement "represents a fair and reasonable resolution of a *bona fide* dispute under the" FLSA. *E.g.*, *Salcedo v. D'Arcy Buick GMC, Inc.*, No. 15 C 3677, 2016 WL 7635882, at *1 (N.D. Ill. May 13, 2016); *see also Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1352 (11th Cir. 1982). When considering whether to approve settlements, the court serves as "a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 280 (7th Cir. 2002).

Courts routinely approve FLSA settlements when they are reached as a result of contested litigation to resolve bona fide disputes. *Koszyk v. Country Fin. a/k/a CC Servs., Inc.*, No. 16 Civ. 3571, 2016 WL 5109196, at *1 (N.D. Ill. Sept. 16, 2016). Generally speaking, if the proposed settlement reflects a reasonable compromise over contested issues, the court should approve the settlement. But first, the court must determine whether the proposed settlement is both fair and reasonable, and this includes an evaluation of the reasonableness of the attorneys' fees sought. *See Bligh v. Constr. Res. of Ind., Inc.*, No. 1:15-CV-00234-JD-SLC, 2016 WL5724893, at *2 (N.D. Ind. Aug. 10, 2016). In cases such as these, when a fee-shifting

statute is involved, a heightened level of scrutiny as to the attorneys' fees is appropriate. There has been a veritable explosion in the number of filings involving the FLSA, and the court is well aware of the ability of fee-shifting statutes such as the FLSA to create windfall recoveries for attorneys.[3] *See Velasquez v. Digital Page, Inc.*, No. CV 11-3892, 2016 WL 3636616, at *1 (E.D.N.Y. June 28, 2016); *Wolff v. Royal Am. Mgmt., Inc.*, No. CV-11-351-N, 2012 WL 5303665, at *5 (S.D. Ala. Oct. 25, 2012), *aff'd,* 545 F. App'x 791 (11th Cir. 2013) ("FLSA suits are not meant to become a cottage industry divorced from the benefits they provide . . . ."); *Chen v. Jin Holding Grp. Inc.,* No. 10-CV-0414 (PAC), 2012 WL 279719, at *4 (S.D.N.Y. Jan. 31, 2012) (FLSA "was not designed to create a windfall for attorneys" or to encourage an attorney to pursue litigation towards an "unreasonable goal") (citing *Farrar v. Hobby*, 506 U.S. 103, 115 (1992))). In FLSA actions, the Seventh Circuit has made clear that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate"—known as the "lodestar." *Anderson v. AB Painting & Sandblasting Inc.*, 578 F.3d 542, 544 (7th Cir. 2009) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983)). The party seeking an award of fees bears the burden of proving the reasonableness of the hours worked and the hourly rates claimed, and should submit evidence to this effect. *Hensley*, 461 U.S. at 433.

---

[3] As noted by the Southern District of New York in *Camacho v. Ess-A-Bagel, Inc.*, No. 14-CV-2592 LAK, 2014 WL 6985633, at *1 (S.D.N.Y. Dec. 11, 2014) (quoting *Cisek v. Nat'l Surface Cleaning, Inc.*, 954 F. Supp. 110, 110–11 (S.D.N.Y. 1997):
> According to one estimate, FLSA filings have increased some 400 percent nationwide since 2001 and now comprise nearly nine percent of all new civil cases in this district. In such circumstances, courts must remain alert to the risk that the filing and settling of FLSA cases has become a volume-based business and that "the interest of plaintiff's counsel in counsel's own compensation will adversely affect the extent of the relief counsel will procure for the clients."

## III. ANALYSIS

### A. This is a Common Fund Case

The parties maintain that this case does not involve allocation of a common settlement fund between class members and counsel and that it was neither negotiated nor structured as a "common fund" case. (April 2017 Joint Supplemental Mem. 9–12.) Rather, they argue that this settlement fundamentally differs from Rule 23 settlements because the FLSA contains a statutory fee-shifting provision to which the principles of proportionality analysis in cases like *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) do not apply. *See id.*

As used here, the phrase "common fund" has come to have a specific meaning in approving settlements under Rule 23: "[o]nce a settlement has been reached in a class action, the attorneys for the class petition the court for compensation from the settlement or common fund created for the class's benefit." *Sutton v. Bernard*, 504 F.3d 688, 691 (7th Cir. 2007) (stating this is "[a]lso known as the common fund doctrine"). Put succinctly, in common fund cases, "the goal in awarding a reasonable attorneys' fee is to give the lawyer what he would have received in an arms-length negotiation" in the marketplace given the risk of recovering nothing at all. *Id.* at 692 (citing *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992)). The court should attempt to "award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Id.* (quoting *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001)).

Common fund analysis should not be conflated with the principles governing a determination of whether attorneys' fees are reasonable under a fee-shifting statute, however. *See id.* (holding that "the district court misapplied the principles that govern fee shifting cases to the common fund case before it"). Courts typically utilize the lodestar method to determine the

7

amount of reasonable fees to be awarded under a fee-shifting provision like the FLSA's. *See, e.g.*, *Spegon v. Catholic Bishop of Chi.¸* 175 F.3d 544, 550 (7th Cir. 1999) (utilizing lodestar method to determine fee award). In *Sutton*, *supra*, the Seventh Circuit explained the different treatment of common fund and fee-shifting analysis this way: "In a common fund case, where the defendant's liability is limited to the amount paid into the fund, there is no danger of unduly burdening that party with payment of the plaintiffs' attorneys' fee for time spent on unsuccessful claims." 504 F.3d at 693. While relevant, the degree of success achieved does not control the analysis under a fee-shifting statute; rather, the Seventh Circuit requires the court to take a market-based approach that "depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." *Id.* at 693 (quoting *Synthroid*, 264 F.3d at 721). Under the market-based approach, courts have approved fee awards that are disproportionate to the class' recovery. *See, e.g.*, *SKF USA Inc. v. Bjerkness*, Nos. 08 C 4709, 09 C 2232, 2011 WL 4501395 (N.D. Ill. Sept. 27, 2011) (approving a $1.3 million fee award where damages were $81,068 because by enacting a fee-shifting statute, Congress predetermined the claim was worth bringing given the risk of modest recovery). Fee-shifting statutes reflect a Congressional judgment that market disincentives for attorneys to bring risky or potentially low-value claims should be overcome to vindicate the statute's policy goals. *See Anderson*, 578 F.3d at 545 (noting that "Congress wants even small violations of certain laws to be checked through private litigation); *Dominguez v. Quigley's Irish Pub, Inc.*, 897 F. Supp. 2d 674, 687 (N.D. Ill. 2012) (observing that "the purpose of a fee shifting statute, which is to enable smaller claims to be litigated, would be thwarted if attorneys' fees had to be strictly proportional to the amount recovered").

The parties' supplemental memorandum does not address the apparent cap of defendants' liability for attorneys' fees reflected in the proposed settlement agreement.  Paragraph fifteen of the proposed settlement agreement begins: "Defendants agree to pay a total sum of $4,800,000.00 to fund their settlement obligations in the Actions . . . .  Payments by Defendants pursuant to this Settlement Agreement shall settle all pending issues between the Parties, including . . . attorneys' fees and costs."  (Proposed Settlement Agreement ¶ 15, ECF No. 474-1.)  The agreement recites that the gross settlement value is $4.8 million (*id.* ¶ 15(a)) and then allocates $1,011,236.59 to gross wage payments (*id.* ¶ 15(b)).  But the agreement does not expressly state what accounts for the remainder of the gross settlement value.  (*See id.* ¶¶ 15(b)–(k).)  The balance, however, comes from the request for fees made by plaintiffs' counsel totaling $3,441,230.50 and costs totaling $325,000.  (*See* Mem. Supp. Mot. Approval 37, ECF No. 474.)

The parties bargained for this fee amount.  Plaintiff's counsel represents that they realized during settlement discussions that they would need to "seek a reduced lodestar" to resolve this case.  (April 2017 Joint Supplemental Mem. 9–10.)  They have done so, according to their motion, to the tune of 49% of the lodestar amount to which they believe themselves entitled.  (*See* Mem. Supp. Mot. Approval 36–37, ECF No. 474; *see also* Cotiguala Supplemental Decl. ¶¶ 3, 7–10, ECF No. 481-4 (discussing allocation of fees amongst the lawyers who represented the plaintiffs).)

So the proposed settlement effectively allocates a single fund of $4.8 million between counsel and class members.  In evaluating a petition for fees, "[t]he loadstar [sic] is used as a base figure which may then be increased or decreased in light of [several] factors . . . ." *Mojica v. Gannett Co.*, No. 90 C 3827, 1992 WL 51685, at *2 (N.D. Ill. Mar. 3, 1992) (citing *Leffler v. Meer*, 936 F.2d 981, 985 (7th Cir. 1991)).  If fees are truly separate from the entire $4.8 million

9

settlement fund, defendants must bear the risk of an award of fees and costs exceeding the $3.8 million plaintiffs' counsel have agreed to seek. The parties have not clarified what happens to the funds in the $4.8 million gross settlement amount if the court does not award all of the $3.8 million in fees and costs agreed to. (Proposed Settlement Agreement ¶¶ 15(a)–(i).) But no matter what the court does with a fee petition, defendants' gross liability can be no more than $4.8 million under the settlement agreement, which is expressly conditioned upon court approval. (*See id.* ¶ 14.) Having decided that the settlement allocates a common fund, the court turns to the question of whether Rule 23 principles used to analyze such cases have any role to play in an FLSA case. *See Castillo v. Noodles & Co.*, No. 16-cv-03036, 2016 WL 7451626, at *5–6 (N.D. Ill. Dec. 23, 2016) (finding contingency-fee arrangement created common fund).

**B. Applying Proportionality Principles Causes the Court to Take a Close Look at the Proposed Settlement**

A series of recent Seventh Circuit cases decided under Rule 23 have established a principle of proportionality to guide courts in evaluating whether there is evidence of collusion in a proposed settlement of a common fund case. *See CE Design, Ltd. v. King Supply Co.*, 791 F.3d 722, 725 (7th Cir. 2015); *Eubank v. Pella Corp.*, 753 F.3d 718, 721 (7th Cir. 2014); *Redman*, 768 F.3d at 630. "The ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman*, 768 F.3d at 630. "[I]n consumer class actions . . . the presumption should we suggest be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014); *Castillo*, 2016 WL 7451626, at *5 (holding one-third recovery reasonable in FLSA collective action and citing Rule 23 cases to establish the market

rate for such recovery in this district); *Briggs v. PNC Fin. Servs. Grp., Inc.*, No. 1:15-cv-10447, 2016 WL 7018566, at *4 (N.D. Ill. Nov. 29, 2016) (same; collecting additional cases).

The parties argue that Rule 23 proportionality principles have no role to play when reviewing a settlement of an FLSA collective action. The principal difference between FLSA collective actions and Rule 23 class actions "is that plaintiffs who wish to be included in a collective action must affirmatively opt-in to the suit by filing a written consent with the court, while the typical class action includes all potential plaintiffs that meet the class definition and do not opt-out." *Alvarez v. City of Chicago*, 605 F.3d 445, 448 (7th Cir. 2010); *see also Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 73–74 (2013) (contrasting Rule 23 and FLSA class actions in a case about mootness). But this court is hard pressed to see how the dangers of collusion vary materially when a collective action is settled and a Rule 23 class is settled; decisions to opt in or out significantly precede any notification of the fees requested. As with a Rule 23 settlement, the degree to which an FLSA settlement results from arms-length bargaining bears on whether the class's interests have been adequately protected. *Compare Koszyk*, 2016 WL 5109196, at *1 (finding, among other things, that FLSA settlement resulted from "contested litigation with substantial informal discovery, and arm's-length negotiations"), *with CE Design*, 791 F.3d at 725 (collecting cases and explaining that in Rule 23 class action, "the optimal settlement for [class counsel and representatives] is one that awards large attorneys' fees to class counsel but modest damages to the class members" rather than maximizing class members' returns). Because *Redman* and its progeny take aim at the same danger that exists in FLSA settlements, their analysis serves as a useful, but not dispositive, starting point for evaluating whether there is evidence of collusion in a proposed FLSA settlement.

Applying *Redman*'s formula to the proposed settlement, 3.3 million to about 4.4 million

equals a 76% fee. This amount exceeds the one-third to one-half rule of thumb for consumer class actions the Seventh Circuit has suggested. *See Pearson*, 772 F.3d at 782. Furthermore, the $4.93 per rounded workweek some class members will recover comprises 27% of the $18 potential liquidated claim plaintiffs say they are potentially entitled to. That said, this is not a consumer case, and so rather than treat the disproportionality as substantially fatal, as might be the case under Rule 23, the court uses this finding as guidance. The disproportionality of fees to benefits to class members causes the court to take a close look at the proposed settlement to assure that it results from arms-length negotiations and settles a bona fide dispute.

**C. Settlement Preliminarily Approved**

On closer examination, the court is persuaded that in light of the FLSA's fee-shifting provision, the settlement in *Las*, and the broader scope of this litigation, the proposed settlement should be approved. The Seventh Circuit has refused to adopt "any mechanical rules requiring that a reasonable attorney's fee be no greater than some multiple of the damages claimed or recovered." *Moriarty v. Svec,* 233 F.3d 955, 968 (7th Cir. 2000). Leaving open the possibility of fees even when counsel pursues risky theories accords with the Supreme Court's long-standing interpretation of the FLSA as meaning "that an employee cannot contract to give up nor otherwise waive rights to overtime or the minimum wage that are guaranteed by the FLSA." *Molina v. First Line Solutions LLC*, 566 F. Supp. 2d 770, 778 (N.D. Ill. 2007) (citing *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945) and *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728 (1981)).

The parties' supplemental memorandum elaborates on the risks presented by further litigation. The defendants have a good-faith basis to argue that some opt-in plaintiffs were entitled to limited or no recovery given potential offsets. Moreover, plaintiffs faced risks that the

12

defendants would be successful in seeking decertification due to the lack of a common theory. Some class members alleged rounding violations in their hours; others said they worked off the clock. And a possible offset defense attributable to lunch breaks also threatened to facture the classes, as did the forty-five different collective bargaining agreements under which class members worked. While the court implies nothing about the merits of those issues, plaintiffs' counsel have demonstrated that their fears about the risk of full or partial decertification and the expense of further discovery and practice in fragmented litigation are justified. *See* April 2017 Joint Supplemental Mem. 15–17, 18–19; *see also Burkholder v. City of Fort Wayne*, 750 F. Supp. 2d 990, 996 (N.D. Ind. 2010) (considering reasonable opinion of attorney that cost of taking individual depositions of every class member in part justified settlement). That is, the parties have demonstrated that they propose to settle a bona fide FLSA dispute.

In light of the *Las* settlement, the court also finds the proposed settlement to be fair and reasonable. The settlement class here will receive either $4.93 or $2.87 per work week in compensation. (Proposed Settlement Agreement ¶ 15.) Judge Nordberg approved the same payment ($4.93) per rounded work week in *Las*. (Mem. Supp. Mot. Approval 8, ECF No. 474.) The fact that a previous settlement using the same formula for similarly situated janitors has been approved strongly suggests that it is reasonable here, and indeed, the motion for approval may have turned out differently without *Las*. The fact that it was reached with the assistance of a mediator experienced in complex wage-and-hour disputes lends further weight to that conclusion, for "[t]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." *Burkholder*, 750 F. Supp. 2d at 795 (quoting *Carter v. Anderson Merchandisers, LP*, Nos. EDCV 08-00025-VAP (OPx), EDCV 09-0216-VAP (OPx), 2010 WL 144067, at *6 (C.D. Cal. Jan. 7, 2010)). The record does not disclose the relative

13

strength of the claims and defenses in *Las*; counsel do not compare their positions in *Las* and these cases in detail. Still, the larger, multi-state classes in these cases add complexity and risk not present in *Las*. In the face of increased risks, the fact that the negotiated settlement gains as favorable a recovery for the classes here as the class in *Las* further supports the conclusion that arms-length negotiations produced this settlement. Given these increased risks, the 13% or 27% of the maximum net recovery falls in the range of a reasonable settlement outcome for the class members. *See Sanchez v. Roka Akor Chi. LLC*, No. 14-cv-4645, 2017 WL 1425837, at *7 (N.D. Ill. Apr. 20, 2017) (citing cases describing recoveries of 25–75% of claimed wages as exceptional).

Finally, the court has reviewed the supplemental declarations of Thomas M. Ryan (ECF No. 481-1); Glen J. Dunn (ECF No. 481-2); James X. Bormes (ECF No. 481-3); and Jac A. Cotiguala (ECF No. 481-4) and the accompanying exhibits. Considered in view of the bargain-based scrutiny to which this common fund is subjected, the court finds that the supplemental declarations and evidence adequately address concerns raised in the order entered January 5, 2017. *See Sutton*, 504 F.3d at 691. Mr. Ryan reviewed his original time sheets, wrote off about 442 hours of work entirely, and reduced the hourly rate for a number of tasks that may have been better performed by an associate or paralegal; he billed some of his hours performing administrative tasks at a $100/hour paralegal rate. (Ryan Suppl. Decl. ¶¶ 11, 13, 21–23, 25–36.) His blended hourly rate falls to $293.39 for the 5,039.36 hours of work he personally performed. (*Id.* ¶ 38.) Mr. Dunn has similarly lowered his loadstar rate from $550 to $450 and has reduced his requested rates for certain activities to associate or paralegal levels. (Dunn Supplemental Decl. ¶¶ 5, 7–9.) While Mr. Bormes requests a higher lodestar rate of $485, he has similarly blended his rates. He seeks compensation at $385 per hour for the associate assigned to this case

14

and for himself $485 for litigation work, $325 for document review, and $240 for travel time. (Bormes Supplemental Decl. ¶ 6.) He also has reduced one time entry the court noted in its January 5, 2017, order because the entry was erroneous. (*Id.* ¶ 11.) And Mr. Cotiguala has reduced his requested reimbursement by 15% to $30,000. (Cotiguala Supplemental Decl. ¶ 11.)

**D. The Question of What Happens if an Objection is Overruled Is Unripe**

One matter remains from the supplemental briefing. The parties disagree about whether an opt-in class member who objects should be able to withdraw from the settlement if the court overrules the objection. In the April 2017 Briefing Order, the court raised the question of "whether requiring a class member to accept the settlement if the court overrules an objection violates the principle that an employee cannot contract to give up nor otherwise waive rights to overtime or the minimum wage that are guaranteed by the FLSA." (Order 1 (quotation omitted).) ABM (plaintiffs take no position) cites two cases in which the court approved settlement agreements with similar provisions. *See Arango v. Landry's Inc.*, Case No. 12-cv-9354, ECF No. 233 (N.D. Ill. May 18, 2015) (St. Eve, J.); *Scovil v. Fedex*, No. 10-cv-00515, ECF No. 287 at 21 (D. Me. Mar. 14, 2014). Defendants point out that neither court felt compelled to create an "extra safety-valve" for objecting plaintiffs. (April 2017 Joint Supplemental Mem. 9.) Defendants also argue that "it offends the principle of litigation finality to allow an individual who essentially contracted with Plaintiffs' firms through the notice and consent process to reap the benefits of the enormous legal services and efforts expended thereafter on his or her behalf, consume court time and defense resources through discovery and law and motion, only to be allowed at the very end of the process to object." (*Id.*)

The court does not resolve this issue now, however, because it will only be presented if a class member actually appears, objects, and is overruled. Because the answer to this question

"involves uncertain or contingent events that may not occur as anticipated, or not occur at all," it has not ripened for adjudication and must be left on the vine. *Wis. Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011) (citations omitted). Particularly given that the named plaintiffs and their counsel take no position on this issue, the court defers its adjudication unless and until a class member objects and states that he or she wishes to opt out if the objection is overruled. In that event, the court can better test the issue through adversary briefing in in which the objector's interests will be represented. The court therefore directs the parties to modify the proposed notice to the class.

## IV. CONCLUSION

The motion for preliminary approval of the proposed settlement (ECF No. 474) is granted as modified by the parties after the hearing held December 21, 2016, and by the supplemental requests for reduced attorneys' fees (*see* ECF No. 481.) The parties are directed to contact the courtroom deputy to set a date for a final hearing and thereafter to submit a revised proposed notice on or before October 5, 2017.

Date: September 21, 2017 /s/
Joan B. Gottschall
United States District Judge